IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

```
SOCIETY OF PROFESSIONAL        )
ENGINEERING EMPLOYEES IN       )
AEROSPACE, et al.,             )
                               )
               Plaintiffs,     )    CIVIL ACTION
                               )
v.                             )    Nos. 05-1251-MLB
                               )         07-1043-MLB
BOEING CO., et al.,            )
                               )
               Defendants.     )
_____)
```

<u>MEMORANDUM AND ORDER</u>

This case comes before the court on cross motions for summary judgment.  Plaintiffs' motion is denied and Boeing's[1] motion is denied in part and granted in part for the reasons stated herein.

I.   **Facts[2] and Procedural History**

   A.   **The Parties**

Plaintiff Society of Professional Engineering Employees in Aerospace ("SPEEA"), plaintiff International Association of Machinists and Aerospace Workers ("IAM") and plaintiff District Lodge 70 are unincorporated labor organizations that represent employees in industries affecting commerce for purposes of collective bargaining.

_____

   [1] The several Boeing defendants will be collectively referred to as Boeing unless otherwise noted.

   [2] All facts set forth are either uncontroverted, or, if controverted, taken in the light most favorable, along with all favorable inferences, to the non-moving party.  <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670 (10th Cir. 1998).  To the extent relevant, the factual disagreements between the parties will be noted. The court has not included statements that are irrelevant to the analysis at hand.  <u>See</u> <u>Adler</u>, 144 F.3d at 670 ("[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim.").

These unions represented a majority of the workforce at Boeing.[3]

In addition, several individuals are plaintiffs in this case. On July 14, 2008, this court granted certification for one class of plaintiffs, the "Harkness Class." (Doc. 118). Plaintiffs David A. Harkness, William G. Hartig, Jr., David Lewandowski, Jene Lewandowski, Ronald Owens, Richard Pullen, Tomey Shabshab, Donna Zagonel, and Michael Baker, are the named representatives for the Harkness Class. The Harkness Class is the group of plaintiffs who accepted employment with Spirit.

There are two additional groups of plaintiffs who are not certified as a class and are referred to as the "McCartney/Boone Plaintiffs." Those plaintiffs are Michael McCartney, Norris Palmer, Bradley Stevens, Margaret Wieland, James Boone, Bruce Carselowey, Marsha Gray, Darlene Kerns, Randall McFarland, Larry Moore, Russell Norman, James Queen, Timothy Sanders, Marlon Stocking, William Stoner, Lisa Wright, and Gary Leavell. The McCartney/Boone plaintiffs are those individuals who either did not accept an offer of employment with Spirit or failed to sign a consent form to be eligible for employment with Spirit.[4]

---

[3] International Brotherhood of Electrical Workers, Local 271 ("IBEW 271") is not a named party in this case. Two of its members, Michael Baker and Larry Moore, are named plaintiffs in the Harkness Class and the McCartney/Boone plaintiffs, respectively.

[4] Plaintiffs Michael McCartney, Margaret Wieland, Randall McFarland, James Boone, Lisa Wright, Timothy Sanders, Darlene Kerns, and Marsha Gray declined offers of employment with Spirit.

Plaintiffs Norris Palmer, Bradley Stevens, Gary Leavell, Russell Norman, Marlon Stocking, William Stoner, Larry Moore, James Queen, and Bruce Carselowey did not sign the Consent to Release Information form required for them to be considered for employment by Spirit.

The individual plaintiffs began employment at various times at Boeing's Facility in Wichita ("Wichita plant") in positions that were within bargaining units represented by SPEEA, the IAM and IBEW 271. All the named individual plaintiffs had 10 or more years of service and were between 49 and 54 years of age as of June 16, 2005, and have now turned 55.[5]

The Boeing defendants are as follows: The Boeing Company ("Boeing") is a corporation that previously operated a commercial aircraft manufacturing company in Wichita, Kansas. Boeing currently operates other plants around the United States. The Boeing Company Employee Retirement Plan ("BCERP") is an ERISA-covered employee pension benefit plan that provides certain specified pension benefits to eligible participants in accordance with the terms and conditions of that plan. The Boeing Retiree Health and Welfare Benefit Plan ("BRHP") is an ERISA-covered employee welfare benefit plan that provides certain specified benefits to eligible participants in accordance with the terms and conditions of that plan. The Boeing Company Layoff Benefits Plan ("Boeing Layoff Benefits Plan") provides certain severance benefits for eligible Plan participants in accordance with the terms and conditions of that Plan. Boeing is the sponsor of the BCERP, the Boeing Retiree Health Plan, and the Boeing Layoff Benefits Plan.

The Boeing Employee Benefits Plans Committee ("Committee" or

---

[5] The specific information concerning each individual's date of birth and employment history with Boeing can be found in the pretrial order. (Doc. 548)

"EBPC") is the Plan Administrator of the BCERP, BRHP[6], and Boeing Layoff Benefits Plan.  The Committee is comprised of Boeing officers and employees, appointed to the Committee by Boeing's Board of Directors.

Spirit AeroSystems Holdings, Inc. ("Spirit Holdings") is a Delaware corporation with its headquarters in Kansas.  Spirit AeroSystems, Inc. ("Spirit"), is a wholly-owned subsidiary of Spirit Holdings.  The Spirit AeroSystems Holdings, Inc. Pension Value Plan ("the Spirit Plan") is an employee pension benefit plan that provides certain specified benefits to eligible participants in accordance with the terms and conditions of that plan. The Spirit AeroSystems Holdings, Inc. Retirement Plan for IBEW, WEU, WTPU and IAM Employees was merged into the Spirit Plan on or about December 31, 2005.  Spirit Holdings is the plan sponsor of the Spirit Plan.[7]

### B.   Boeing Sale

In 2003, Boeing decided to bundle its commercial aircraft assets in Wichita, Tulsa and McAlester, Oklahoma, to sell to an as then unknown company.  Boeing's plan was for the new company to manufacture

---

[6] The Boeing Company VEBA Master Trust (the "Trust") is the funding mechanism for the Retiree Health Plan. Some of the benefits Boeing provides under the Retiree Health Plan are self-funded and others are fully-insured. Boeing makes contributions to the Trust (including premium payments from the participants), which are then utilized to purchase or provide the retiree medical coverage. For insured benefits, premiums are paid from the Trust to the insurer. For self-funded benefits, the benefits are funded from the Trust and paid to a third-party administrator who pays the providers.

[7] The Spirit defendants have not moved for summary judgment at this time.  On November 27, 2012, this court issued an order preliminarily approving voluntary dismissal of all claims against Spirit defendants with prejudice.  (Doc. 579).  After the individual Harkness class members receive notice, the court will hold a fairness hearing on June 3, 2013.

parts and then sell those parts to Boeing.  Boeing assigned a team of personnel to work on employment issues concerning the potential sale. In 2005, Boeing sold certain assets associated with its manufacture of commercial airplanes in Wichita and Oklahoma to Onex, a private equity firm, which had created a company called Mid-Western Aircraft Systems, Inc. ("Mid-Western") to hold the purchased assets and to operate the commercial airplane business.    Mid-Western was later renamed Spirit.    On February 22, 2005, Boeing and Mid-Western (hereinafter "Spirit") executed an Asset Purchase Agreement (APA). The unions were not consulted by Boeing or Spirit about the terms of the APA.

In March 2005, Boeing advised the unions and employees of the Wichita plant that Worker Adjustment and Retraining Notification Act (WARN) notices[8] would be issued in connection with the sale of assets

---

[8] Boeing drafted Workforce Administration Redeployment Guidelines to assist management in the event of layoffs and redeployment of employees who are subject to layoff.   The guidelines discuss the issuance of a 60 day WARN notification to employees who will be subject to a "layoff."

WARN notices were issued on March 11 to give 60-day notices to affected employees.   The first negotiated sale date was May 13, 2005. However, the sale was not completed on that date.   Boeing sent additional notices advising of a new date between June 16 and 29, 2005.

The WARN notice issued to the IBEW representative stated as follows:

> Pursuant to the Worker Adjustment and Retraining Notification Act, this is to advise you the Boeing Company will be conducting a layoff in the Wichita area commencing May 13, 2005 due to the sale of the Wichita/Tulsa division. These layoffs are expected to be permanent (exceeding 6 months in duration).

> It is anticipated that approximately 195 persons represented by your organization will be placed on layoff.

-5-

to Spirit.

Boeing entered separate talks, called "effects bargaining," with IAM, SPEEA, and IBEW 271 over the effects of the sale of the assets of the Boeing Commercial Aircraft facility in Wichita.  There was no agreement, however, as to the effect of the sale with respect to the issues before the court and especially those relating to a "lay off."  Boeing ultimately retained a small number of employees to continue with its military projects which were not subject to the sale.  The remaining employees received WARN notices which advised them of their recall rights, as set forth in the CBAs, to certain positions that each individual was qualified for.[9]

Spirit announced that it planned to operate the Wichita plant to manufacture airplane parts and that it would hire most of the Boeing employees.  All Boeing employees who worked at the Wichita plant were informed that they were required to sign a Consent to Release Information form as a condition to be considered for employment by Spirit.  The consent form allowed Boeing to disclose the employees' employment records to Spirit.

Spirit interviewed the Boeing managers of certain employees who

---

Employees on leave of absence may be laid off upon their return from leave of absence.  Attached is a roster listing those employees who we anticipate will be affected by this reduction on May 13, 2005.

(Doc. 552, exh. E-2).

[9] Boeing admits that it agreed during negotiations to allow recall rights for IAM- and IBEW-represented employees.  Notably, the letter advising the IAM- and IBEW-represented employees of their recall rights was issued at the end of June and continued to refer to June 16 as the "layoff" date.  (Doc. 552, exh. E-4).  Boeing, however, disputes recall rights being available for SPEEA-represented employees regardless of the language in the WARN notice.

-6-

applied for work at Spirit.  Spirit hired most but not all of the Boeing employees who sought employment with Spirit.  The employees who applied for but did not receive a position with Spirit were eligible to go through Boeing's redeployment process and were treated as laid off employees.  While Spirit was not required to hire all of Boeing's employees, the APA required Spirit to pay a higher purchase price if it hired less than 90% of Boeing's workforce.

On or about June 17, 2005, referred to as "Day One", Spirit began manufacturing airplane parts in Wichita.  As of that date, approximately 85% of former Boeing employees had been hired by Spirit and started work as Spirit employees, including the members of the Harkness class.

### i. New CBAs and Benefits

Spirit did not assume any of the existing collective bargaining agreements that Boeing had with the unions representing the commercial-division employees in Wichita.  On Day One, Spirit did not have executed collective bargaining agreements with the IAM[10], SPEEA-WEU, or SPEEA-WPTU[11] bargaining units.  When the CBAs were executed, the IAM- and IBEW-represented employees agreed to a 10% pay reduction but negotiated an equity bonus, which ultimately paid out $61,440[12] per employee when Spirit became a public company.  The SPEEA-

---

[10] The IAM CBA was finalized in late June 2005.

[11] The SPEEA CBAs were executed on July 11, 2005.

[12] The amount of the bonus is controverted but not material at this stage.  The employees received a $34,556 cash bonus and 1,034 shares of Spirit Class A stock.  On March 15, 2007, the value of the stock was $31.05 a share.  The value of Spirit's stock, however, has declined.

represented employees declined an offer for reduced pay and therefore received the same pay at Spirit but were not eligible for the bonus.

The APA between Boeing and Spirit included provisions relating to the BCERP and certain assets and liabilities.  Under the terms of the APA, Spirit agreed to assume the accrued pension liabilities for its newly hired employees, i.e. the members of the Harkness Class. Spirit created "mirror pension plans[13]" — the Spirit Plans — for the Harkness Class members who were not yet age 55[14], under which they will receive certain pension benefits when they terminate their employment with Spirit.[15]  Boeing transferred assets from the BCERP to the Spirit Plans that it determined were sufficient to fund the liabilities to the Harkness Class who would be participants in the Spirit Plans. Spirit, however, did not continue to fund these plans for its employees and the assets were in essence frozen.  Spirit's defined contribution plan for its SPEEA and IBEW-represented employees included 401(k) benefits. It was not a defined benefit plan as Boeing had provided.[16]  Spirit also agreed to retain vacation pay, sick leave, create flexible spending accounts and provide health insurance

---

[13] Plaintiffs contend that the benefits were not equivalent to the amount of benefits they would have received if they had been able to retire under the BCERP.

[14] Boeing employees who had reached age 55 were allowed to retire from Boeing, receive retirement benefits under the BCERP and seek employment with Spirit.

[15] With the exception of plaintiff Stevens, plaintiffs did not receive benefits from the Boeing Layoff Benefits Plan.

[16] The IAM-represented employees elected to participate in the IAM National Pension Fund after the sale.

-8-

benefits[17] for its employees and eligible retirees.[18]   Spirit's estimated savings in employee compensation and benefits was $100 million for the first year of operation.

C.   **Boeing's Employment Classifications After the Sale**

Boeing treated the departing commercial division employees differently depending on the employees' circumstances.   Employees who accepted positions with Spirit were considered "terminated pursuant to divestiture," which is abbreviated as "TER-DIV."   Employees who applied for a position with Spirit but were not hired were considered to be "laid off" from Boeing.   Finally, Boeing employees who did not apply for a position with Spirit or declined an offer of employment with Spirit were considered "resigned" from employment.   The EBPC had

---

[17] Boeing had provided a no-cost health plan in addition to plans with premiums.   Spirit did not offer a no-cost health plan.   Spirit's health insurance required a substantial increase in monthly payments and deductibles.   Additionally, employees at Spirit were required to pay co-pays with office visits.

[18] The APA required as follows:

> Without limiting the scope of Section 6.2(a), as of the Closing, Buyer shall be responsible for and shall maintain retiree medical coverage for the benefit of each Hired Employee who was eligible for or could have become eligible for (after meeting applicable age and service requirements) retiree medical coverage maintained by Seller and who is not receiving retiree medical benefits from Seller, and shall provide each such Hired Employee full credit for periods of service prior to the Closing for all purposes thereunder, subject to the provisions of any collective bargaining agreements between Buyer and the unions.

(Doc. 562, exh. A-26 at ¶ 6.2(g)).

However, Spirit did not provide subsidized health insurance benefits to retirees until they reached age 62, unlike the Boeing plan which provided those benefits at age 55.   Spirit provides retirees with medical benefits at age 55, however they are not subsidized.

informed all Boeing employees prior to the sale that employees who refused to apply for or declined a position at Spirit and those who went to work at Spirit would not be treated as "laid off" for the purposes of pension, medical and severance benefits.

The terms "laid off" and layoff" are used in various Boeing documents but they are never defined.

### D. This Action

On August 8, 2005, SPEEA filed this action against Boeing, asserting claims pursuant to § 301 of the LMRA, § 510 of ERISA and the Declaratory Judgment Act. (Doc. 1). On January 20, 2006, SPEEA moved to add the IAM as a party. Boeing objected and moved to dismiss SPEEA's ERISA claims. The court granted Boeing's motion to dismiss SPEEA's ERISA claims and allowed IAM to join. On February 16, 2007, plaintiffs Harkness, Hartig, David and Jene Lewandowski, Owens, Pullen, Shabshab, Zagonel, McCartney, Palmer, Stevens, and Wieland filed a complaint asserting claims under ERISA[19], § 301 of the LMRA, and the Declaratory Judgment Act against Boeing, the BCERP, the Retiree Health Plan, the EBPC, Spirit Holdings, and the Spirit Mirror Plans in case number 07-1043.[20]

The individual plaintiffs assert claims under ERISA for the denial of their subsidized early retirement benefits and retiree medical benefits, the transfer of the pension assets, and eliminating the "layoff bridge" benefits. The "layoff bridge" benefits were

---

[19] These individuals were the first named plaintiffs in this action. They include members of both the Harkness class and the McCartney/Boone plaintiffs.

[20] The 2007 case was consolidated with the 2005 case on January 3, 2008.

available to employees who were laid off between the ages of 49 and 54 with ten years of service at Boeing.  These benefits are referred to as the "layoff bridge" because they bridge an individual who was laid off from Boeing to early retirement and certain health benefits, without that individual returning to active employment at Boeing.

Additionally, the individual plaintiffs assert claims under ERISA for a breach of fiduciary duty.  Ten individual plaintiffs assert an ERISA claim for denial of severance benefits.  All plaintiffs assert claims for breach of the CBAs under section 301 of the LMRA.

Boeing contends that plaintiffs' claims are barred because they failed to exhaust their administrative remedies.  Additionally, Boeing responds that it did not breach the CBAs nor violate ERISA because all individual plaintiffs were not laid off from their employment with Boeing.

Plaintiffs now move for partial summary judgment on their breach of contract claims.  Boeing defendants move for summary judgment on all claims.  The motions require somewhat detailed consideration of the various collective bargaining agreements or CBAs.

**E.   The CBAs**

At various times, the unions bargained with Boeing over the terms and conditions of Boeing's employment of bargaining unit employees.

A CBA between SPEEA and Boeing covering the Wichita Technical and Professional Unit ("WTPU") was executed on July 7, 2004.  The SPEEA-WTPU bargaining unit was decertified at Boeing in June 2007.

A CBA between SPEEA and Boeing covering the Wichita Engineering Unit ("WEU") was executed on December 6, 2002. SPEEA and Boeing executed another CBA effective on December 20, 2005.

-11-

A CBA between IAM and Boeing was executed on September 2, 2002. IAM represented Boeing's production employees in Wichita.

A CBA between IBEW 271 and Boeing was executed on December 3, 2002.  IBEW 271 represented Boeing's electrical workers.

**F.    CBA and BCERP Language Relevant to the Claims**

Termination of Employment/Layoff

All CBAs discussed circumstances in which an employee can be terminated and/or lose his or her seniority rights with Boeing.  The SPEEA CBAs stated that "employees shall not be suspended or discharged without just cause."  (Doc. 552, exhs. B-1 and B-2 at Art. 3.2(b)). The IBEW CBA and IAM CBA stated that "An individual shall lose seniority rights for the following reasons: 4.3(a) Resignation; (an individual who, while on a leave of absence, engages in other employment not approved by the Company, or fails to report for work or to obtain renewal of his leave on or before it's [sic] expiration, will be considered as having resigned); 4.3(b) Discharge for cause." (Docs. 552, exh. E-1 at Art. 4.3; 552, exh. R-1 at Art. 14.3).

The CBAs also provided for a series of job-retention protections for employees in the event of a "workforce reduction," a "surplus" of employees or a "reduction in force."  Therefore, an employee with seniority, or a SPEEA employee with a higher retention rating, who was subject to a job loss because of an event, could displace an employee who did not have the same seniority.  The SPEEA CBAs also included a provision called the "CEO Clause" which allowed Boeing to avoid the ratings-based procedure if Boeing's CEO determined an exception was needed.

In  addition  to  the  provisions  discussing  seniority  and

-12-

terminations, all CBAs contained provisions to provide layoff benefits in the form of a lump sum or income continuation based on a formula, and medical coverage for three months to Boeing employees who were laid off.  The benefits were available to an employee who was a member of a participating group of employees, had at least one year of service and experienced a layoff event.  However, there was an exception for employees who were "laid off from the Company because of a merger, sale or similar transfer of assets and are offered employment with the new employer."

As with the Boeing documents, none of the CBAs define the terms "laid off" or "layoff."

<u>Early Retirement</u>

The CBAs also had provisions specific to the BCERP and stated that eligibility for benefits under the BCERP will be determined pursuant to provisions contained in a separate document not attached to the CBAs.  The document set forth the following provision concerning early retirement:

> A Participant may retire on an Early Retirement Date which, subject to his or her election, may be the first day of any month coincident with or next following the later of the Participant's 55th birthday or the date of the Participant's Termination of Employment, provided that if the Participant is less than age 62, the Participant must either:
>
> (a) have ten or more Years of Service,
> (b) have some Credited Service and have been issued a declaration of permanent and total disability .
> . . or
> (c) have some Credited Service and be laid off on or after the date the Participant attains age 55.

(Doc. 562, exh. QQ-1 at ¶ 3.2).

The BCERP variously defined a participant as an "active

-13-

participant," "inactive participant," "terminated vested participant," or "retired participant." The BCERP further defined "inactive participant" as a prior Active Participant who was on an Authorized Period of Absence, which included an employee who was absent with authorization due to a "layoff not to exceed six years duration."[21] (Doc. 562, exh. QQ-1 at ¶ 1.7).

The BCERP identified basic benefit rates for both Active Participants and Participants on an Authorized Period of Absence. Participants on an Authorized Period of Absence who retired at age 55 were subject to a 10% reduction in benefits. However, participants who were terminated after they vested in their retirement benefits were subject to a 60% reduction in benefits if they chose to retire at age 55. Participants who elected an early retirement had to refrain from employment with Boeing but could be employed with another company.

Health Benefits

Additionally, all CBAs included provisions which set forth the existence of the Boeing Retiree Health Plan, which was included as attachment B to all CBAs and provided as follows:

> For employees covered on or after July 1, 2003, the Company will provide for the duration of this agreement for eligible retired employees and for covered dependents of eligible retired employees the medical benefits summarized

---

[21] The definition continues as follows: "Any discretion of the Company under the provisions of this definition will be exercised without discrimination and in accordance with definitely established rules uniformly applicable to Employees or Participants whose approved periods of absence were occasioned by similar circumstances." (Doc. 562, exh. QQ-1 at ¶ 1.7). This additional language was deleted by Boeing from the BCERP as part of a restatement that was effective January 1, 2006. The unions were told of the amendment but were not asked for an agreement to the change.

in the document entitled Attachment B, effective July 1, 2003, or on such later date when specifically stated therein and subject to all of the terms and conditions contained in or referred to in such Attachment B.  The program summarized in Attachment B shall be referred to as the Retiree Medical Plan.

(Doc. 552, exh. E-1 at 11.3)[22].

The Retiree Medical Plan stated that the following requirements must be satisfied for employees to eligible under the plan:

To be eligible for the Retiree Medical Plan, the employee must retire from the service of the Company under the Company-sponsored retirement plan at age 55 or older with ten (10) or more years of vesting service under a Company-sponsored retirement plan.

If an employee becomes eligible for disability benefits under the Company sponsored retirement plan, the employee also is eligible for the Retiree Medical Plan if he or she is at least age 50 and has ten (10) or more years of vesting service at retirement.

A retired employee who is at least age 55 and has ten (10) or more years of vesting service at retirement is eligible for the Retiree Medical Plan if he or she retires under the Company-sponsored retirement plan within the following time limits:

• Two (2) years following the start of an approved leave of absence, provided the approved leave of absence has not ended  prior to the employees retirement.

• Six (6) years following the employee's layoff.

A retired employee no longer is eligible for coverage under the Retiree Medical Plan after attaining age 65 or becoming eligible for Medicare.

(Doc. 552, exh. R-1 at attachment B)[23].

---

[22] All CBAs include this provision and have an Attachment B. (Doc. 552, at exhs. B-1 at ¶ 16.3; B-2 at ¶ 16.3; R-1 at ¶ 11.3). The only differences in these provisions are the dates stated for eligibility which does not effect the outcome of the issues in this case.

[23] Again, the other CBAs included virtually identical language. (Doc. 552, exhs. B-1 and B-2 at Attachment B; E-1 at Attachment B).

Therefore, while a terminated vested participant[24] was eligible for pension benefits at a 60% reduction at age 55, he or she was not eligible for retiree health care benefits.

### G.   Claims and Grievances

### i.   CBA Grievance Provisions

All CBAs contained articles which set forth the scope and procedures for grievances.  The SPEEA CBAs stated that "grievances arising between the Company and its employees subject to this Agreement, or between the Company and the Union, with respect to the interpretation or application of any of the terms of this Agreement shall be settled according to the following procedure."  (Doc. 556, exh. A-7 at Art. 3.1).[25]  With respect to the BCERP, all CBAs provided that only questions concerning the amount of Credited Service were subject to the grievance and arbitration procedure.  The CBAs also stated that no question or issue arising under the administration of the Retiree Medical Plan was subject to the grievance and arbitration procedure.

All CBAs provided a grievance procedure that was to be used by the employee.  The SPEEA CBAs allowed for an employee to appeal a layoff, discharge or involuntary resignation by filing a grievance

---

[24] A terminated vested participant is defined as a prior Eligible Employee [defined in section 1.21] who has incurred a Termination of Employment, who retains a Vested Interest in accordance with Section 6.1 [of the BCERP], and who is not currently receiving benefit payments under the plan.

[25] The IAM CBA has language similar to the SPEEA CBAs.  The IBEW CBA stated that "only matters dealing with the interpretation or application of terms of this Agreement shall be subject to this grievance machinery."  (Doc. 556, exh. A-4 at 12.2).

through the Union within ten workdays after the employment action.[26] The SPEEA and the IAM CBAs provided that a Union versus Company grievance must be submitted within ten days after the occurrence of the last event on which the grievance is based.[27]  If no agreement was reached with respect to the grievance, the Union had a set period in which to request an arbiter.

### ii. Grievances to the Company

On June 22, 2005, the IAM filed a "union versus company" grievance asserting that employees with 10 years of service and who were age 49 to 55 years old and ceased to be employed by Boeing as a result of the Wichita divestiture to Spirit were "in fact laid off from Boeing and are entitled to the negotiated benefits of early retirement and early retirement medical benefits."  (Doc. 552, exh. R-2).

Boeing denied the IAM's June 22 grievance on June 30, 2005, and stated that "the grievance is not subject to arbitration," citing sections 10.4 and 11.6 of the IAM CBA.  Boeing further stated that, "in any event," employees who accepted work with Spirit are not "eligible for early retirement bridging under a Boeing pension plan or the Retiree Medical Plan" because, among other things, their "pension benefits transferred to Onex and there is no remaining Company-sponsored retirement plan with Boeing under which such employees can retire." (Doc. 552, exh. R-3).  After receiving this

---

[26] The IAM CBA required the filing of the grievance to be within seven days.  The IBEW CBA required that the employee file his or her grievance within three days.

[27] The IBEW CBA required the Union to file its grievance within seven days.

letter, the IAM filed an arbitration request to which Boeing never responded.

In addition, six IAM-represented individuals who were classified as voluntarily resigned filed timely grievances through the IAM. Four of those individuals are members of the McCartney/Boone plaintiffs. No IAM-represented individuals who began employment with Spirit filed a grievance.

SPEEA filed a grievance with Boeing on August 29, 2005, after initiating this suit on August 8.[28] SPEEA's written grievance informed Boeing that it was "grieving the coding of [its] represented employees upon completion of their Boeing service as a result of the BCA Wichita divestiture." The grievance further stated that: "Article 8 and Article 21 of the Collective Bargaining Agreements clearly indicate the intent a [sic] coding of 'layoff' for all employees upon the completion of their advance notification of layoff (WARN) notices." SPEEA did not request arbitration after filing its grievance. IBEW did not file a written grievance with Boeing pertaining to the layoff bridge benefits. No SPEEA or IBEW-represented employee filed a grievance with the union representative concerning his or her employment status.

---

[28] There are significant disputes of fact as to whether Boeing's representative Jim Edenfield told IBEW and SPEEA representatives that Boeing would refuse to arbitrate the grievance of the layoff bridge benefits. Both IBEW and SPEEA contend in declarations made by their respective union representatives that they were told that Boeing refused to arbitrate this issue prior to June 30, 2005, the deadline for filing a grievance under the CBAs. However, this testimony is inconsistent with the deposition testimony of the same union representatives. At this stage of the proceedings, however, the court cannot make credibility determinations. Nat'l Am. Ins. Co. v. Am. Re-Insurance Co., 358 F.3d 736, 742 (10th Cir. 2004).

### iii. Individual Grievances to the BCERP and Boeing Layoff Benefits Plan

Prior to the sale, the unions engaged in effects bargaining with Boeing specifically discussing the ability of employees aged 49 to 54 to be eligible for the "layoff bridge" retirement benefits. The parties never reached an agreement on the issue. Subsequent to the sale, all but one of the Harkness class plaintiffs filed claims for benefits or clarification of future benefits under the BCERP and the Boeing Retiree Health Plan.[29] Each of those plaintiffs was issued a written denial and all, with the exception of McFarland, appealed those denials. The EBPC denied each of the appeals.

The Harkness plaintiffs were denied benefits by Boeing Pension Operations on the basis that their benefits had been transferred to the Spirit plan. On appeal, the EBPC determined that Harkness[30] "was not 'laid off' for purposes of the BCERP and, therefore, is also not eligible for "layoff bridge" benefits under the Plans. The [EBPC] has determined that Claimant ceased to be a Participant in the BCERP (Section 1.32) effective as of his separation from the Company because: (a) he experienced a Termination of Employment, which is defined as a cessation of employment due to voluntary or involuntary

---

[29] Harkness class plaintiffs who filed claims were Harkness, Hartig, David Lewandowski, Jene Lewandowski, Owens, Pullen, Shabshab, Zagonel, McCartney, McFarland, Palmer, Stevens, and Wieland.

Plaintiff Baker, although a Harkness class member, did not file a claim for benefits or clarification of future benefits under the BCERP or the Boeing Retiree Health Plan.

[30] The EBPC listed the same reasons for denial in all Harkness class members' claims. The locations of those exhibits are set forth in Doc. 556 at ¶ 254.

-19-

termination or separation of employment (Section 1.41(a)), and (b) all assets and liabilities attributable to Claimant's BCERP benefit were transferred to, and assumed by, the Onex/Spirit Pension Plan pursuant to the terms of Section 14.7 of the BCERP." (Doc. 552, exh. L-3 at 8). The Harkness class plaintiffs were also denied retiree health care benefits on the basis that they were not participants in and did not retire under the BCERP.

The McCartney/Boone plaintiffs sought early retirement pursuant to the 90% formula for participants on an approved leave. Their requests were denied and appeals followed. The EBPC discussed its denial of McCartney's appeal as follows, noting that there is no definition for the term "layoff" while, at the same time, stating that the "definition" of "layoff" was not satisfied:

> The Committee finds that the "layoff" is nowhere defined in the BCERP. Therefore it is the Committee's responsibility to determine whether Claimant's cessation of employment with the Company qualified as a layoff for purposes of the BCERP.
>
> ***
>
> Article 17 of Claimant's collective bargaining agreement provides that eligibility for retirement income is based on the provisions of the BCERP. Thus, the collective bargaining agreement expressly disclaims any jurisdiction over Claimant's eligibility to receive retirement benefits under the BCERP. Therefore, pursuant to the terms of the BCERP, the Committee finds that only the terms of the BCERP are relevant in determining whether Claimant experienced a "layoff."
>
> ***
>
> The facts and conditions surrounding the participant's termination of employment must satisfy the definition of

"layoff."[31] The Company's notification to Wichita Division employees that they were at risk of layoff, without more, does not qualify their subsequent terminations as a "layoff' for purposes of the Retiree Health Plan and the BCERP. Not all employees who were at risk of layoff were in fact laid off. Only those who participated in the offer process in good faith and were not offered employment by Onex/Spirit were considered laid off by the Company. The Committee acknowledges that the Company issued layoff notices to all Wichita Division employees sixty days prior to the Divestiture; however, this was done because the Company did not know which employees would be offered employment by Onex/Spirit. A notice that a participant is "at risk" of a layoff does not by itself convert his or her subsequent cessation of employment with the Company into a layoff. Also, subsequent communications made it clear that not all employees would be considered laid off.

\*\*\*

Claimant next claims that because Onex/Spirit did not assume liability for retiree health benefits Claimant should continue to be eligible for retiree health benefits under the Retiree Health Plan. The Committee disagrees with this claim. The 2003 Benefits Update clearly provides that an employee must retire under the BCERP to be entitled to receive retiree medical benefits under the Retiree Health Plan.  Moreover, as indicated numerous times above, Onex/Spirit agreed to be responsible for the retiree medical benefits of transferred employees subject to collective bargaining.

\*\*\*

The Committee finds that Claimant is not entitled to bridging benefits under the BCERP. He did not experience a "layoff" under the terms of the BCERP.[32] Moreover, because he refused the offer of employment with Onex/Spirit, his accrued benefit was not transferred but he became a Terminated Vested participant in the BCERP as a result of his voluntary termination. Based on these findings, the Committee further finds that Claimant is not eligible to "bridge" into retiree health benefits under the Retiree Health Plan.

(Doc. 552, exh. L-4 at 8, 10, 12-13).

---

[31] What definition?  Whose definition?  Where is it?

[32] Once again, the "terms" of the BCERP which supposedly define a "layoff" are not identified.

-21-

The EBPC issued similar denials to all McCartney/Boone plaintiffs. Boeing subsequently sent written communication to former employees stating that the EBPC's decision on the issue of the layoff bridge was final and would not change during the pendency of this case. Boeing instructed former employees to cease filing appeals. Plaintiffs McCartney, Palmer, and Stevens additionally filed claims for severance benefits under the Boeing Layoff Benefits Plan which were denied.

### H.    Plan Changes

Following the sale of Boeing Wichita, Boeing made a change to the BCERP on September 14, 2005.[33] The amendment explained that the assets and liabilities associated with the transferred employees benefits would be transferred to the successor plan at Spirit.[34] The amendment expanded section 14 of the BCERP as follows:

14.4 Release of Liability

> After a Transfer occurs, the Plan fully relinquishes liabilities associated with Transferred Persons. As a result, the Plan will not be liable for the liabilities that are transferred or spunoff, even as a secondary payor should the Recipient Plan fail to pay benefits. Transferred Persons will no longer be considered participants or beneficiaries under sections 3(7) and 3(8) of ERISA, and will not have standing under sections 502 and 503 of ERISA with respect to this Plan.

(Doc. 552, exh. L-5 at 2).

Boeing did not discuss the amendment with the unions prior to the revision. The amendment was not ratified or approved by the unions

---

[33] An additional change made unilaterally by Boeing is discussed in footnote 21, supra.

[34] With respect to the IAM-represented employees, the amendment states that those liabilities and assets will be transferred to the IAM plan.

in their representation of the Day One Spirit employees.

**I.   Boeing Sales of Other Plants**

As previously noted, Boeing began restructuring its business practices around 2000.  Boeing made a decision to outsource manufacturing to other companies.  As a result, Boeing began selling its existing manufacturing assets to third-party companies.  The Wichita plant is only one example.  In addition to the Wichita sale, Boeing sold two plants located in Washington state.  Those sales occurred in 2002 and 2003.  The union employees in Washington were represented by IAM and SPEEA and were covered under the BCERP.

Similar to the Wichita sale, the new owners of the Washington plants did not adopt the union contracts.  The employees had to apply for positions with the new company and new terms were negotiated with the unions.  Unlike the Wichita sale, however, Boeing retained the pension plan for the union-represented employees.  The employees who accepted offers with the new company were classified in Boeing's system as "terminated pursuant to a divestiture ('TER-DIV')."  One union employee who rejected a job offer from the new company in Spokane was classified as "terminat[ed] pursuant to a reduction in force without severance pay."  The employees who began work with the new companies and were at least 49 years old subsequently filed for early retirement benefits from the BCERP when they reached the age of 55.  The BCERP granted the applications for early retirement benefits for all of those employees.  The employees were also eligible for the early retiree health care benefits.  The employees, however, were not eligible for the layoff severance benefit.

**J.   Contemporary Litigation Concerning Boeing Sale**

-23-

With respect to the sale of the Oklahoma plants, the United Auto Workers Union (UAW) filed a suit against Boeing seeking to compel Boeing to arbitrate the layoff issue. The UAW was successful and the parties continued to arbitration. The arbitrator determined that Boeing breached the CBA by failing to classify the Boeing workers as laid off. The arbitrator then issued a remedy award to the employees, finding that the employees were eligible for the layoff bridge regardless of Boeing's transfer of the assets of the plan to Spirit. Boeing moved to vacate the arbitrator's remedy award. The district court confirmed the award and the decision was affirmed by the Seventh Circuit. Boeing v. UAW, 600 F.3d 722 (7th Cir. 2010)

Additionally, a class action was filed in this district alleging that the Wichita-area Boeing employees who applied for, but did not receive, a position at Spirit were terminated in violation of the ADEA and ERISA. See Apsley, et al. v. Boeing, Case No. 05-1369. The Apsley plaintiffs were classified as laid off by the EBPC for benefits purposes. In various pleadings, Boeing argued that the Spirit sale was equivalent to plant-wide layoffs or reductions in force. Boeing also referred to the employees as being terminated as a result of the sale. The court determined that the Apsley plaintiffs must establish evidence of a conspiracy in order to succeed on their claims because Boeing uniformly terminated all employees on June 16. At summary judgment, the court held that the plaintiffs had not met their burden and granted judgment in favor of Boeing.[35]

---

[35] This decision was affirmed by the Tenth Circuit. Apsley v. Boeing, 691 F.3d 1184 (10th Cir. 2012). The case is still pending in this court on the remaining claims.

## II.  Summary Judgment Standards

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim.  Adamson v. Multi Community Diversified Svcs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Even though the parties have filed cross-motions for summary judgment, the legal standard does not change.  See United Wats, Inc. v. Cincinnati Ins. Co., 971 F. Supp. 1375, 1382 (D. Kan. 1997).  It remains this court's sole objective to discern whether there are any disputes of material fact, see Harrison W. Corp. v. Gulf Oil Co., 662 F.2d 690, 692 (10th Cir. 1981), and the court will treat each motion separately.  See Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).

**III. Analysis**

**A.    Breach of Contract**

Plaintiffs and Boeing have moved for summary judgment on plaintiffs' claims of breach of the CBAs.  Plaintiffs assert that Boeing has breached the CBAs by 1) failing to classify all employees as laid off after the sale to Spirit and 2) amending the BCERP. Boeing contends judgment should be granted in its favor because plaintiffs failed to adhere to the grievance procedure set forth in the CBAs and the employees were not laid off as a consequence of the sale.  The court will first turn to Boeing's motion which seeks summary judgment on all breach of contract claims on the basis that plaintiffs failed to exhaust their administrative remedies.

**i.    Boeing's Motion for Summary Judgment - Failure to Exhaust**

"As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress." Republic Steel Corp. v. Maddox, 379 U.S. 650, 652, 85 S. Ct. 614, 13 L. Ed.2d 580 (1965). "[U]nless the contract provides otherwise, there can be no doubt that the employee must afford the union the opportunity to act on his behalf." Id. at 652-53.  "Exhaustion is excused when: (1) it would be futile; (2) the employer through its conduct has repudiated the grievance procedure itself; or (3) the union has prevented the employee from utilizing the grievance process

by breaching its duty of fair representation[36]." Garvin v. Am. Tel. & Tel. Co., 174 F.3d 1087, 1093 (10th Cir. 1999).

As an initial matter, the CBAs provide that all grievances arising under the CBAs are subject to the grievance policy unless there is an exception. The BCERP is a separate document and the CBAs all set forth an exception for grievances which arise under the BCERP. Specifically, the CBAs state that only the amount of credited service under the BCERP is subject to the grievance procedure. Therefore, plaintiffs' failure to follow the grievance procedure in this instance is not fatal to their claim.

Turning to the layoff claim, however, the CBAs do contain a provision which allows an employee to appeal a decision of an employment action, i.e. layoff or termination, by filing a grievance within a certain time period. Therefore, this claim would be subject to the grievance procedure.[37]

Boeing contends that summary judgment should be granted in its favor because of plaintiffs' failure to exhaust the administrative remedies with respect to the layoff claim. Plaintiffs respond that

---

[36] Boeing asserts that the individual plaintiffs' claims fail because they have not alleged claims of inadequate representation by the unions and have failed to file grievances in accordance with the CBAs. The individual plaintiffs, however, are not claiming that their failure to exhaust is excused by the unions' failure to act. Rather, plaintiffs argue that Boeing repudiated the grievance procedure and that Boeing is estopped from raising the defense because of its actions. Therefore, plaintiffs say, it was not necessary for the individual plaintiffs to allege inadequate representation in this case.

[37] On June 30, 2005, Boeing informed the IAM that the grievance was not subject to arbitration. (Doc. 561, exh. E-7). Boeing now takes the position that this issue should have been grieved by all plaintiffs and presented to an arbitrator because it involves interpretation of terms in the CBAs. (Doc. 556 at 77-81).

Boeing repudiated the grievance procedure and should be estopped from raising the defense of exhaustion because Boeing failed to timely move to compel arbitration.

An employer is estopped from relying on unexhausted grievance and arbitration procedures when the employer has effectively repudiated the procedures. <u>Garcia v. Eidal Int'l Corp.</u>, 808 F.2d 717, 721 (10th Cir. 1986)(citing <u>Vaca v. Sipes</u>, 386 U.S. 171, 185 (1967)). "An employer's repudiation may take the form of either an express refusal to abide by contractually established grievance and arbitration machinery . . . or conduct which renders the employer unable or apparently unable to comply." <u>Id.</u> at 721-22.[38] "[I]n determining whether one party has so repudiated his promise to arbitrate that the other party is excused the circumstances of the claimed repudiation are critically important" and plaintiffs "must show some specific basis for believing that the breaching party would not submit the matter to arbitration, and conclusory allegations will not fulfill this requirement." <u>Id.</u>

Boeing cites to a Seventh Circuit opinion and states that repudiation "does not occur when the parties merely disagree about the 'effect of some substantive provision of the contract.'" (Doc. 556

---

[38] Boeing asserts that repudiation "occurs only 'when [an] employer proclaims that it no longer considers the obligation to arbitrate binding,'" citing to an opinion written by Judge Rogers in 1998. (Doc. 556 at 83). That opinion, however, did not discuss an issue of repudiation because Judge Rogers stated that a claim of repudiation was not made in that case. <u>See</u> <u>Lohf v. Runyon</u>, 999 F. Supp. 1430, 1437 (D. Kan. 1998). For many reasons, this court is at a loss to understand why Boeing would cite <u>Lohf</u>. Perhaps Boeing mistakenly thinks the court does not read the cases cited in memoranda. The court finds that the holding in <u>Garcia</u> is the applicable law in this case.

at 91, citing <u>Bailey v. Bicknell Minerals, Inc.</u>, 819 F.2d 690 (7th Cir. 1987)).  <u>Bailey</u>, however, is distinguishable.  In <u>Bailey</u>, the plaintiffs asserted that the defendant repudiated the bargaining agreement simply because "any breach of contract . . . is a repudiation."  The Seventh Circuit also noted that the defendant did not state that it would not proceed to arbitration.

In this case there is a written statement by Boeing to IAM which stated that "the grievance is not subject to arbitration."[39]  In addition, Boeing did not respond to the IAM's request for arbitration which was filed in response to Boeing's June 30 letter.[40]

The court finds that there is sufficient evidence to create a factual issue as to whether Boeing repudiated its agreement to arbitrate with the IAM and whether the IAM complied with its obligations set forth in the CBA.  Therefore, Boeing's motion for summary judgment against the IAM and the IAM-represented plaintiffs for failure to exhaust administrative remedies is therefore denied.

Turning to the IBEW and SPEEA plaintiffs, there is additional evidence that Boeing informed their union officials of its position that the grievance was not subject to the arbitration procedure.  However, that evidence is disputed by Boeing.  Viewing the evidence

---

[39] The IAM did not submit its individual member grievances to Boeing in accordance with the terms of the CBA.

[40] Boeing asserts that the exhausted grievance is somehow different from the current claim concerning "whether Boeing should have coded its members as 'laid off.'" (Doc. 556 at 81).  However, the grievance clearly states that the "Union asserts the employees are in fact laid off from Boeing." (Doc. 552, exh. R-2).  Even though the main thrust of the grievance concerns retirement benefits, the court finds that the IAM grievance was sufficient to put Boeing on notice of the coding claim and Boeing's treatment of the IAM-represented employees.

in a light most favorable to plaintiffs, a jury could find that Boeing "would not submit the matter to arbitration." Garcia, 808 F.2d at 722.

The court finds that a genuine dispute of material fact exists as to whether Boeing repudiated the grievance procedures with respect to all plaintiffs' claims and therefore denies Boeing's motion for summary judgment based on the contentions that these plaintiffs failed to exhaust their claims.

**ii. Plaintiffs' Motion for Summary Judgment on Boeing's Exhaustion Defense**

Turning to plaintiffs' motion for summary judgment, plaintiffs seek a ruling that Boeing is estopped from raising the defense of failure to exhaust, citing Reid Burton Const., Inc. v. Carpenters Dist. Council of S. Colo., 614 F.2d 698 (10th Cir. 1980), for the proposition that "arbitration may not be preserved as a bar to relief unless the party relying on it affirmatively moves to stay the case and compel arbitration." (Doc. 566 at 3). Essentially, plaintiffs argue, as a matter of law, that Boeing has waived the defense of failure to exhaust by actively participating in this suit without moving to compel arbitration. Boeing hotly disputes this characterization of Reid Burton and the parties spend a significant amount of time briefing its applicability.

In Reid Burton, the plaintiff construction company brought suit against two defendant unions for an alleged breach of the CBA. The plaintiff, however, did not adhere to the arbitration procedure and the defendants asserted the CBA's arbitration clause as a bar to the plaintiff's claim. The case proceeded to trial without the defendants

moving to stay the proceeding.[41]  At trial, the defendants raised the arbitration issue with a witness and informed the court that the defendants were willing to proceed to arbitration.  The district court found that the "unions played games with plaintiff and the court too long to now insist on an injunctive order requiring plaintiff to arbitrate this stale dispute."

On appeal, the defendants argued that "they did not waive their right to assert the **arbitration defense** by not moving for a stay or by participating in the litigation. . . . Mere delay, they say, does not constitute waiver, absent such a showing of prejudice; defendants were not obligated to move for a stay; and the mere filing of a counterclaim does not waive the defense."  614 F.2d at 701-02 (emphasis supplied).  The Circuit explained that the court must review several factors in determining whether a defendant has waived its right to arbitration.

> In determining whether a party to an arbitration agreement, usually a defendant, has waived its arbitration right, federal courts typically have looked to whether the party has actually participated in the lawsuit or has taken other action inconsistent with his right;  whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit by the time an intention to arbitrate was communicated by the defendant to the plaintiff; whether there has been a long delay in seeking a stay or whether the enforcement of arbitration was brought up when trial was near at hand.

> Other relevant factors are whether the defendants have invoked the jurisdiction of the court by filing a counterclaim without asking for a stay of the proceedings; whether important intervening steps (e. g., taking advantage of judicial discovery procedures not available in arbitration had taken place); and whether the other party was affected, misled, or prejudiced by the delay.

---

[41] There is no notation of any pretrial dispositive motions on the defense of failure to arbitrate.

614 F.2d at 702.

The Circuit continued citing a Fifth Circuit case, <u>Burton-Dixie</u> <u>Corp. v. Timothy McCarty Const. Co.</u>, 436 F.2d 405 (5th Cir. 1971), which confronted the waiver issue in a "context substantially similar to the present one." <u>Burton-Dixie</u> is similar to this case.    In <u>Burton-Dixie</u>, the plaintiff hired the defendant to construct a building.    The parties entered into a contract that contained a provision in which disputes were submitted to an architect and thence to arbitration.    The plaintiff initiated several requests to repair roof leaks in the building but the defendant did not replace the roof. The plaintiff did not adhere to the arbitration procedure in the contract but instead filed suit.    The defendant did not move to compel arbitration or stay the proceedings but "rather denied liability and set up as an affirmative defense [the plaintiff's] failure to arbitrate."  436 F.2d at 409.    After the jury returned a verdict in favor of the plaintiff, the defendant moved for judgment as a matter of law on the basis that the plaintiff failed to comply with the arbitration procedures.    The district court denied the motion and that decision was upheld by the Fifth Circuit.    The Fifth Circuit found that the jury could have reasonably concluded that the defendant "waived its right to insist upon arbitration."  <u>Id.</u>

Boeing asserts that <u>Reid-Burton</u> is distinguishable and the Tenth Circuit did not hold that a defendant may waive his right to a defense of failure to arbitrate.    The court disagrees.    The Circuit specifically discussed the defendant's argument that it did not waive its right to raise the failure to arbitrate defense.    In doing so, the

-32-

Circuit pointed to <u>Burton-Dixie</u> which confronted the exact issue here.

Turning to the factors cited by the Circuit and applying them to this case, the court finds that Boeing has clearly taken advantage of this forum by extensively utilizing the discovery process offered in court but not available in arbitration.  This case has proceeded for more than <u>seven</u> years and Boeing has filed countless discovery motions.  The filings in this case have exceeded <u>500</u> documents.  In those 500 documents, Boeing has never moved to dismiss on the basis of failure to exhaust even though Boeing was aware of the grievance procedures in 2005 and the two unions' alleged lack of compliance with those procedures.  Boeing also has neglected to file a motion to compel arbitration or stay the proceedings, even after plaintiffs stated in their response that they will consent to arbitration.[42] (Doc. 566 at 9-10).  Moreover, prior to the entry of the pretrial order on October 3, 2011, more than six years after the case was filed, Boeing's documented position has been that these issues were not subject to arbitration.  Clearly, Boeing has taken actions which are not consistent in a party who wishes to arbitrate a dispute.

The court finds that there are sufficient facts present for a reasonable fact finder to conclude that Boeing waived the right to

---

[42] During its consideration of the parties' extremely extensive dispositive motion submissions, the court became concerned that it might be making a mistake if it didn't order arbitration on some issues.  The court was so uncertain about Boeing's seemingly inconsistent positions that it was compelled to issue a letter which required Boeing to unambiguously state "yes or no" whether it would agree to plaintiffs' expressed willingness to arbitrate.  Doc. 571. Boeing responded with a "no" but in a long letter (actually two letters) which essentially repeated arguments advanced in its memoranda.  Docs. 572, 576.  Plaintiffs' response can be found at docket 573.  The court is satisfied that ordering arbitration would have been a complete waste of time and resources.

arbitration and the right to assert plaintiffs' failure to arbitrate as a defense.  Therefore, the court finds that there are material disputes of fact which preclude summary judgment for plaintiffs on the issue of waiver.

### iii. Collateral Estoppel

### 1.    Arbitration of the Oklahoma Sale

Initially, plaintiffs contend in their motion for summary judgment on the breach of contract claims that the decision of the Seventh Circuit in Boeing v. UAW, 600 F.3d 722 (7th Cir. 2010), has collateral estoppel effect in this case.  Boeing disagrees.

Collateral estoppel will bar a claim if the following elements are met: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.  Moss v. Kopp, 559 F.3d 1155, 1161-62 (10th Cir. 2009).

The first element is not met in this case.  Here, the court must determine whether a breach of the CBAs occurred.  The Seventh Circuit was not faced with that issue.  As set forth clearly in the decision of the district court, "Boeing disagreed with the arbitrator's decision [which concluded it breached the CBA] but acknowledges that it has no legal ground to contest it.  Therefore, the arbitrator's decision that Boeing breached the CBA by classifying the employees as terminated is final and uncontested."  Boeing v. UAW, No. 09-2213, 2009 WL 3027446 (N.D. Ill. Sept. 16, 2009).  The only issue before the

court was the "relief ordered by the arbitrator." Id. Therefore, Boeing is not precluded from arguing that it did not breach the CBAs.

## 2. Apsley

Next, plaintiffs contend that Boeing is precluded from asserting that plaintiffs were not "laid off" because Boeing took that position in the Apsley case. Again, the first element of collateral estoppel is not met. Plaintiffs have not established that their status of "laid off" was at issue in that case. Although Boeing did refer to all employees as "laid off"[43] in some filings, the court in Apsley did not face the issue which is before this court. In Apsley, Judge Melgren granted Boeing's and Spirit's motion for summary judgment on the plaintiffs' ERISA claim of implementing the Wichita sale to interfere with their pension benefits, plaintiffs' ADEA claims and plaintiffs' claim of breach of contract for failing to allow them to vote on the new CBA after they did not receive offers of employment from Spirit. At no point in the decision by Judge Melgren did he determine whether all employees at Boeing were laid off at the time of the sale. Therefore, the first element has not been met and the Apsley decision has no preclusive effect[44].

---

[43] Boeing also referred to the same employees as terminated.

[44] Plaintiffs' position on this issue is difficult to understand. Plaintiffs pick out the times that Boeing has used the words "laid off" in its briefs in Apsley and asks the court to conclude that Boeing can't reverse course and say plaintiffs are not "laid off." Boeing, however, correctly points out that it has always been its position that the Apsley plaintiffs were laid off because they never received job offers from Spirit even though they had submitted consent forms. Plaintiffs have not submitted any authority which would preclude a defendant from taking a different position in a different lawsuit. Contrary to plaintiffs' belief, collateral estoppel is the preclusive effect of an issue decided by a court and not a party's isolated statements in a brief.

**iv.  Breach of CBA Provision Concerning Laid Off Status**

Section 301 of the LMRA "governs claims founded directly on rights created by collective-bargaining agreements [CBAs], and also claims substantially dependent on analysis of a collective-bargaining agreement." Caterpillar, Inc. v. Williams, 482 U.S. 386, 394 (1987). This requires the court to analyze the CBAs to determine what the parties agreed to and the legal consequences that were intended by referring to uniform federal law. Johnson v. Beatrice Foods Co., 921 F.2d 1015, 1019 (10th Cir. 1990)(citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211, 105 S. Ct. 1904 (1985)).

Actions under section 301 typically have been analogized to actions for breach of contract. Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 569-570, 110 S. Ct. 1339, 1347 (1990); Held v. Mfrs. Hanover Leasing Corp., 912 F.2d 1197, 1206 (10th Cir. 1990).  Therefore, the enforcement and interpretation of collective bargaining agreements are governed by traditional rules of contract interpretation as long as their application is not inconsistent with federal labor policy. UAW v. Yard-Man, Inc., 716 F.2d 1476, 1479 (6th Cir. 1983).  When a dispute arises as to a provision in the CBA, the court is to first look at the explicit provisions in the CBA in making a determination as to the intended meaning of the parties. Winnett v. Caterpillar, Inc., 553 F.3d 1000, 1008 (6th Cir. 2009).  When the term is ambiguous, the court may turn to extrinsic evidence. Webb v. ABF Freight Sys., Inc., 155 F.3d 1230 (10th Cir. 1998); UAW v. BVR Liquidating, 190 F.3d 768, 772, 774 (6th Cir. 1999).

The Tenth Circuit has held that with respect to labor contracts,

"a fact-finder is entitled-and indeed, in some cases required-to look to the past practices of the parties and the common law of the shop to determine the parties' contractual obligations." Webb, 155 F.3d at 1243-44 (citing United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82 (1960) (holding that the interpretation of contract terms "is not confined to the express provisions of the contract, as the industrial common law-the practices of the industry and the shop-is equally a part of the collective bargaining agreement although not expressed in it"); Nat'l Labor Relations Bd. v. NE Okla. City Mfg. Co., 631 F.2d 669, 676 (10th Cir. 1980) ("Where past practice has established a meaning for language that is used by the parties in a new agreement, the language will be presumed to have the meaning given it by such past practice.")) If the court decides that the language is ambiguous, "then resolution of the ambiguity is a question of fact to be determined by the jury." John Morrell & Co. v. Local Union 304A of United Food and Commercial Workers, AFL-CIO, 913 F.2d 544, 551 (8th Cir. 1990).

In this case, the contracts in question are the CBAs and the fundamental issues resolve around the meaning and effect of the terms "laid off" and "layoff," which appear numerous times in the CBAs as well as in Boeing documents. It is reasonable to assume that when the CBAs were negotiated, the parties were aware of the history of layoffs in the aircraft industry in general and Boeing in particular. But for some reason, the terms are not defined, either in the CBAs or in various Boeing documents. Because of that lack of clarity, the CBAs are ambiguous.

The court has carefully and repeatedly reviewed the parties'

arguments relating to the section 301 question.  (Docs. 552 at 60-68;
556 at 76-86; 566 at 23-33).  Clearly, the parties have different
views as to the meaning of the terms "laid off" or "layoff."  Boeing
contends that the court must look to the ordinary meaning of the
terms, including the definition of layoff in Black's Law Dictionary
and Webster's Third New International Dictionary.  (Doc. 556 at 99).
The court is not persuaded by Boeing's argument because of the lack
of any indication in the CBAs that the parties intended the terms to
be interpreted according to dictionary definitions.  The parties had
the ability to define the terms in the CBAs and the term "laid off"
has been defined in at least one prior case.  See Garvin v. American
Tel. & Tel. Co., 174 F.3d 1087 (10th Cir. 1999).  But far more
persuasive is the Circuit's decision in McIlravy v. Kerr-McGee Coal
Corp., 204 F.3d 1031 (10th Cir. 2000).  At the outset, the Circuit,
in an earlier decision (119 F.3d 876), reversed Judge Brimmer's grant
of summary judgment on the breach of contract claim and sent the case
back for a jury trial.  It also made the following very pertinent
observation about use of dictionary definitions and the term "layoff:"

> In the present case, an inquiry into the plain
> meaning of the term "layoff" reveals that that term can
> denote either a permanent or a temporary termination of
> employment.  The term is variously defined as "[a]
> termination of employment at the will of employer. Such may
> be temporary ... or permanent," Black's Law Dictionary 888
> (6th ed. 1990), and "the act of laying off an employee or
> workforce," to wit, "to cease to employ (a worker)
> usu[ally] temporarily," Webster's Ninth New Collegiate
> Dictionary 679 (1991).
>
> Because the term "layoff" may denote either a
> permanent or temporary termination of employment, that term
> is ambiguous in the present case. We cannot say here that
> "the evidence points but one way and is susceptible to no
> reasonable inferences supporting" appellees' position.
> ("[I]n case of doubt as to the meaning of an instrument,

> the doubt will be resolved against the scrivener....”). We agree with the district court that it was appropriate to submit the breach of contract claim to the jury.

Id. at 1038 (internal citations omitted).

The parties also have different positions concerning the evidence to be considered in determining the meaning of the terms.  For example, plaintiffs urge the court to consider Boeing's actions and practices in connection with the sales of Boeing's Kent and Spokane, Washington facilities which plaintiffs say were "identical" to the Wichita sale.  Not so, says Boeing: "But the Kent and Spokane transactions were structured differently. . . ."  Many other examples can be cited, but to no purpose.

The court finds that there are disputes of material fact which preclude summary judgment on the section 301 breach of contract claims and a trial is necessary.

In the amended complaint, plaintiffs seek a jury trial.  Boeing responds that a jury trial is not available.  Therefore, the parties will be allowed to file memoranda on plaintiffs' right to a jury trial on the section 301 claims as well as any other claims[45].  Both memoranda may not exceed ten double-spaced pages.  Footnotes may not be used to get around the page limits.  No replies will be allowed.  Plaintiffs' brief is due on January 7.  Defendants must respond by January 18.  No requests for additional time will be considered.

**v.   Breach of the CBAs due to the Amendment of the Plan**

Next, the Harkness class and the unions assert that Boeing

---

[45] The court presumes that plaintiffs are not seeking a jury trial on the ERISA claims.  If this presumption is in error, plaintiffs may inform the court in their memoranda.

breached the CBAs by unilaterally changing provisions in the BCERP. Boeing moves for summary judgment on the basis that plaintiffs should be estopped from proceeding on their claim because they have benefitted from the Spirit transaction. Plaintiffs move for summary judgment on the basis that the CBAs required all parties to agree to an amendment and Boeing breached the CBAs by changing the language of the BCERP.

Boeing unilaterally added the following amendment to the BCERP which states as follows:

14.4 Release of Liability

After a Transfer occurs, the Plan fully relinquishes liabilities associated with Transferred Persons. As a result, the Plan will not be liable for the liabilities that are transferred or spunoff, even as a secondary payor should the Recipient Plan fail to pay benefits. Transferred Persons will no longer be considered participants or beneficiaries under sections 3(7) and 3(8) of ERISA, and will not have standing under sections 502 and 503 of ERISA with respect to this Plan.[46]

(Doc. 552, exh. L-5 at 2).

Boeing also deleted a portion of the definition of an "inactive participant" in the BCERP. The BCERP defines "inactive participant" as a prior Active Participant who is on an Authorized Period of Absence, which includes an employee who is absent which is authorized by [Boeing] due to a "layoff not to exceed six years duration." (Doc. 562, exh. QQ-1 at ¶ 1.7). Prior to the deletion, the definition continued as follows: "Any discretion of the Company under the provisions of this definition will be exercised without discrimination

---

[46] With respect to the IAM-represented employees, the amendment states that those liabilities and assets will be transferred to the IAM plan.

and in accordance with definitely established rules uniformly applicable to Employees or Participants whose approved periods of absence were occasioned by similar circumstances." (Doc. 562, exh. QQ-1 at ¶ 1.7).

These changes were made by Boeing without any negotiation with the Unions.[47] Boeing, however, cites no provision in the CBAs which would authorize it to make unilateral changes to the plan. In fact, the CBAs specifically state that the plan was to "remain unchanged" with a few negotiated exceptions that were listed in the CBAs. See, e.g., Doc. 552, exh. R-1 at sec. 10.5. Instead of asserting that it had a right to make the changes, Boeing contends that plaintiffs should be estopped from challenging the transfer of the pension assets.

Boeing cites to In re Sampson, 997 F.2d 717 (10th Cir. 1993), a bankruptcy decision, which referred to a Fifth Circuit case that disallowed a bankruptcy discharge on alimony payments. The Sampson opinion, however, does not discuss the defense of estoppel in connection with a breach of an agreement. The court finds that the Tenth Circuit's discussion in a footnote in Sampson is not applicable.

The court, however, declines to grant summary judgment in favor of plaintiffs. Plaintiffs are unable to establish that the breach

---

[47] The IAM terminated its CBA with Boeing effective September 1, 2005. Therefore, there was no CBA in effect at the time of the amendments. Because Boeing made the changes after September 1, the IAM plaintiffs' claim of breach of contract on this issue fails as a matter of law. Boeing's motion for summary judgment on the IAM claim of breach of contract is granted. Plaintiffs' motion is denied.

caused any damages at this stage of the proceedings.[48]  Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Council of Carpenters, 226 F.3d 535, 554 (7th Cir. 2000)(Under § 301, the measure of damages recoverable for a breach of contract is the actual loss sustained as the direct result of the breach.)  The Harkness Class' damages are dependent on their success on the layoff claim.  If the fact finder determines that they were in fact "laid off" from their employment with Boeing, their damages would presumably equal the amount of benefits they should have received if they were able to retire under the BCERP as an eligible participant.  However, the court presumes that the damages would be nonexistent if the Harkness Class was not "laid off" because their benefits were frozen and transferred to the Spirit Plan.[49]

Boeing's and plaintiffs' motions for summary judgment on this claim are denied.

**B.   ERISA Claims**

**i.   Harkness Class**

Plaintiffs also bring various ERISA claims against Boeing. Boeing moves for summary judgment on the basis that the Harkness Class does not have standing to bring ERISA claims because they are no longer participants in the BCERP.  In order to have standing under ERISA, the Harkness Class must have been participants of the plan at the time the complaint was filed.  Hansen v. Harper Excavating, Inc.,

---

[48] The parties have not yet conducted discovery on damages.

[49] At no point do plaintiffs make the alternative argument that they should be able to retire under the BCERP as a terminated vested participant in the event that the fact finder determines that they were not "laid off" from employment with Boeing.

641 F.3d 1216, 1226 (10th Cir. 2011).   The complaint was filed in August 2005, which was prior to the amendment of the BCERP and prior to the transfer of the funds to the new Spirit plan.   The Harkness Class also must fall into one of four categories: (1) an employee currently in covered employment; (2) an employee reasonably expected to be in covered employment; (3) a former employee with a reasonable expectation of returning to covered employment; or (4) a former employee with a colorable claim to vested benefits, which is to say a former employee with a colorable claim that (a) he will prevail in a suit for benefits, or (b) his eligibility requirements will be fulfilled in the future.   Id. (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117–18 (1989).

Plaintiffs argue that the third or fourth category is applicable in this case.   Although the IAM and IBEW employees were subject to recall rights, there is no evidence that there was a "reasonable" expectation that the employees would be recalled.   With respect to the fourth category, the court finds that the Harkness Class could potentially fulfil the requirements of a claim in the future and/or prevail in a suit for benefits.   However, this is dependent upon Boeing's contractual obligation to treat the Harkness class as "laid off."   If Boeing is successful at trial, the Harkness Class members would not have standing to bring ERISA claims.

Therefore, the court declines to rule on the claims of the Harkness Class because the court finds that the outcome at trial would most likely dispose of these claims.   If Boeing prevails, the Harkness Class' ERISA claims would be subject to dismissal for lack of standing.   If the Harkness Class prevails on their breach of contract

-43-

claims, they have agreed that a recovery under ERISA may not be allowed as it would be a duplicative. (Doc. 552 at 100). Plaintiffs and Boeing's motions for summary judgment are denied, without prejudice.

### ii.  McCartney-Boone Plaintiffs

The McCartney-Boone plaintiffs bring individual claims for early retirement benefits, severance benefits and a claim of interference with their ERISA rights. Boeing initially moves for summary judgment on the basis that several plaintiffs failed to exhaust their administrative remedies with the EBPC. Plaintiffs Boone, Carselowey, Gray, Kerns, Leavell, Moore, Norman, Queen, Sanders, Stoner, Stocking, and Wright did not file a claim with the EBPC requesting pension and medical benefits. Plaintiffs Carselowey, Leavell, Moore, Norman, Queen, Stocking, and Stoner did not file a request for severance benefits.

### 1.  Exhaustion

ERISA does not contain an express exhaustion requirement. However, the Tenth Circuit has held that "exhaustion of administrative (i.e., company-or plan-provided) remedies is an implicit prerequisite to seeking judicial relief." McGraw v. Prudential Ins. Co. of Am., 137 F.3d 1253, 1263 (10th Cir. 1998). There are exceptions to the exhaustion requirement, however. The court has the discretion to excuse a plaintiff from exhausting his or her administrative remedies when it would be futile or the remedy would be inadequate. Id. Plaintiffs contend that exhaustion would be futile in this case. Essentially, plaintiffs argue that the EBPC denied all claims for the same reasons and that further claims or appeals would be futile. The

-44-

court agrees.  Based on the evidence before the court, the EBPC issued denials to McCartney, Stevens, Wieland and Palmer.  Those denials included sections which were either verbatim or almost verbatim. (Docs. 560 at A-44; 561 Y-2; 562 at DD-1, GG-1).  Boeing has not provided any significant reason for the court to conclude that other claims would have been handled differently.  With respect to the claim for severance benefits, plaintiffs McCartney, Palmer and Stevens all filed claims.  Based on the EBPC's decisions on those claims, the court finds that any claim for severance benefits would have also been denied and presumably would have included the same boilerplate language.

Therefore, Boeing's motion for summary judgment on the basis that plaintiffs failed to exhaust their administrative remedies is denied.

### 2.   Unlawful Interference

In addition to the individual ERISA claims, the McCartney-Boone plaintiffs bring a claim of unlawful interference of pension benefits in violation of ERISA.  Section 510 provides: "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."

Both plaintiffs and Boeing move for summary judgment on this claim.  Plaintiffs assert that Boeing differentiated between the employees in order to interfere with their receipt of the layoff bridge and health insurance.  To prevail on a § 510 interference

-45-

claim, plaintiffs must show that Boeing had the specific intent to interfere with their protected ERISA rights.  See Phelps v. Field Real Estate Co., 991 F.2d 645, 649 (10th Cir. 1993).   Boeing argues that a sale of a company does not result in a violation of section 510 and cites to Apsley, 722 F. Supp.2d 1218, 1232 (D. Kan. 2010).  Plaintiffs must show some characteristic which would support that Boeing sold the Wichita division to avoid paying the pension benefits, i.e. high number of employees about to vest or high pension costs.   Id. Plaintiffs have not done so.   Rather, plaintiffs arguments in opposition are quite cursory.

Boeing's motion is therefore granted with respect to the McCartney-Boone plaintiffs' interference claim.  Plaintiffs' motion for summary judgment on this claim is accordingly denied.

### 3.   Individual Claims under § 502

#### Severance Benefits Claims

Boeing moves for summary judgment on the McCartney-Boone plaintiffs' claims for severance benefits.[50]  Boeing denied McCartney and Palmer's claim for severance benefits.[51]  Plaintiffs' complaint seeks benefits for all McCartney-Boone plaintiffs who did not receive an offer of employment with Spirit, i.e. those who refused to sign the consent form.[52]

---

[50] Plaintiffs did not move for summary judgment on this claim.

[51] Stevens was paid severance benefits; however, Boeing asserts that Stevens was not due benefits under the CBA.

[52] Plaintiffs Norris Palmer, Bradley Stevens, Gary Leavell, Russell Norman, Marlon Stocking, William Stoner, Larry Moore, James Queen, and Bruce Carselowey did not sign the Consent to Release Information form required for them to be considered for employment by Spirit.

The CBAs provide the following severance benefits for union-represented employees:

> All bargaining unit employees who have at least one (1) years of Company service and who are involuntary laid off from the Company (other than a temporary layoff under Section 22.8, but including employees laid off because of a declining a downgrade offer as allowed under Section 22.6) are eligible to receive the benefit described in Section 23.3; provided, however, the following employees shall not be eligible for the benefit: employees who upon their layoff become employed by a subsidiary or affiliate of the Company; employees who are laid off from the Company because of a merger, sale or similar transfer of assets and are offered employment with the new employer, employees who are laid off because of an act of God, natural disaster or national emergency; employees who are laid off because of a strike, picketing of the Company's premises, work stoppage or any similar action which would interrupt or interfere with any operation of the Company; and employees who terminate employment for any reason other than layoff, including, but not limited to, resignation, dismissal, retirement, death, or leave of absence.

(Doc. 552, exh. R-1)(IAM CBA).[53]

Boeing argues that the EBPC's decisions denying severance benefits were not arbitrary and capricious because it was reasonable to conclude that the employees were not laid off because they did not experience a layoff event when they chose not to pursue employment with Spirit.[54] As discussed, _supra_, the question of whether plaintiffs experienced a layoff is a question which must be resolved at trial. Therefore, Boeing's motion for summary judgment on these claims is denied.

**Early Retirement Benefits**

---

[53] All CBAs have virtually identical provisions. _See_ Doc. 552, exhs. B-1, B-2 and E-1.

[54] Boeing also argues that the McCartney-Boone plaintiffs who refused job offers are not eligible for the severance benefits. Plaintiffs, however, are not seeking benefits for these individuals. _See_ Doc. 372 at ¶ 202.

Both parties move for summary judgment on the McCartney/Boone plaintiffs' claims for early retirement benefits under the BCERP. Plaintiffs contend that the decision finding the McCartney/Boone plaintiffs were not laid off was arbitrary and capricious. Boeing asserts in its motion that the decision was not arbitrary and capricious because the McCartney/Boone plaintiffs failed to accept an offer of employment by Spirit or failed to sign the consent form in good faith.

The BCERP provides the following:

> A Participant may retire on an Early Retirement Date which, subject to his or her election, may be the first day of any month coincident with or next following the later of the Participant's 55th birthday or the date of the Participant's Termination of Employment, provided that if the Participant is less than age 62, the Participant must either:
>
> > (a) have ten or more Years of Service,
> > (b) have some Credited Service and have been issued a declaration of permanent and total disability . . . or
> > (c) have some Credited Service and be *laid off* on or after the date the Participant attains age 55.

(Doc. 562, exh. QQ-1 at ¶ 3.2)(emphasis supplied).

Again, the court has determined that there is a genuine dispute of material fact as to the meaning of "layoff" and "laid off" which must be resolved at trial. Therefore, the court denies Boeing's motions for summary judgment on the McCartney/Boone plaintiffs' individual claims for retirement benefits under the BCERP.

## IV. Conclusion

Plaintiffs' motion for partial summary judgment on plaintiffs' section 301 claims is denied. Boeing's motion for summary judgment

on plaintiffs' section 301 claims is denied in part and granted in part. Boeing's motion for summary judgment on the IAM section 301 claim of breach of contract by amending the BCERP is granted. Boeing's motion for summary judgment as to all other section 301 claims is denied.

Boeing's motion for summary judgment and plaintiffs' motion for summary judgment on the Harkness Class' ERISA claims is denied. Boeing's motion for summary judgment on the McCartney/Boone plaintiffs' individual ERISA claims is denied. Boeing's motion for summary judgment is granted on the McCartney/Boone plaintiffs' claim of interference with ERISA rights.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 10 double-spaced pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp, 810 F. Supp. 1172, 1174 (1992) and this court's Rule 7.3. The response to any motion for reconsideration shall not exceed 10 double-spaced pages. No replies shall be filed.


IT IS SO ORDERED.

Dated this 11th  day of December 2012, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE